Christine V. Williams
Counsel for T&H Services, LLC
Outlook Law, LLC
1016 West 6th Avenue, Suite 306
Anchorage, Alaska 99501
(907) 258-2200
christinewilliams@outlooklaw.com

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| T & H SERVICES, LLC, )<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>CHOCTAW DEFENSE SERVICES, INC., )<br>)<br>Defendants. )<br>_____ ) | Civil Case No. _____ |

**COMPLAINT FOR FRAUD AND DAMAGES**

**INTRODUCTION**

1. This is an action for fraud and damages brought in this Court pursuant to diversity jurisdiction. Damages sought include punitive damages arising from fraud as well as other relief

1

this Court deems appropriate, such as sums due and owing as well as prevailing party attorneys' fees pursuant to Alaska law.

2. Plaintiff, T&H Services, LLC ("T&H"), entered into a subcontract agreement ("Subcontract") with Defendant Choctaw Defense Services, Inc. ("CDS").

3. Prior to entering into the Subcontract, KIRA, Inc. ("KIRA"), executed a teaming agreement ("Teaming Agreement") with Defendant. KIRA would later become acquired by T&H's parent company.

4. The Teaming Agreement set forth the understandings between the parties as to work allotment and sums due pursuant to the Subcontract if the Defendant was awarded a Federal Government contract.

5. Defendant was heavily reliant on the past performance of KIRA as well as the experience of KIRA personnel to qualify for the Government contract.

6. Defendant used the past performance and experience of KIRA in its proposal to the Government, which the Government accepted.

7. Despite making affirmative representations through the Teaming Agreement and to the Government, Defendant failed to follow its representations.

8. At the time the Subcontract was executed, Defendant did not intend to honor its commitments in the Teaming Agreement or resultant and subsequent Subcontract with T&H.

9. In so doing, Defendant affirmatively misrepresented its intent to T&H and has failed to honor its commitment to the Government.

10. This fraud in the inducement and failure to pay sums due T&H is the cause of this lawsuit. Despite T&H's many attempts at resolving any and all disputes short of bringing this lawsuit.

## PARTIES

11. T&H, a limited liability company with its principal place of business at 4208 198th St., SW, Suite 104, Lynnwood, Washington 98036, is wholly owned by Tlingit Haida Tribal Business Corporation ("THTBC"), a federally chartered tribal corporation. T&H was organized in 2014 to pursue economic development activities, including, but not limited to, facility support services and property management for, among others, the Federal Government.

12. THTBC is wholly owned by Central Council Tlingit & Haida Indian Tribes of Alaska, a Federally recognized Alaska Indian Tribe, and with its principal place of business at 320 W. Willoughby Avenue, Juneau, Alaska 99801.

13. In 2016, THTBC entered negotiations to purchase KIRA, which it ultimately did.

14. The Federal Government allows sister subsidiary past performance and experience for contract eligibility to carry forward for Government contracts unless specifically prohibited by the terms of the procurement.

15. The parties involved in the Teaming Agreement and Subcontract allowed the sister subsidiary to come into play once KIRA was bought and subsequently dissolved. Thus, the past performance of KIRA could be used by T&H and, ultimately, by CDS.

16. CDS is a Choctaw Nation of Oklahoma corporation with its principal place of business at 2701 Liberty Parkway, Suite 311, Midwest City, Oklahoma, 73110.

## JURISDICTION AND VENUE

17. The amount in controversy exceed $75,000.

18. CDS is a corporation registered with the State of Oklahoma,

19. CDS is a corporation organized for profit and does business with the Federal Government, *inter alia*, as an 8(a) contractor, and other businesses as such. CDS is also registered as a for profit corporation in Alaska, with a registered agent in Alaska.

20. This Court has subject matter jurisdiction pursuant to 28 USC § 1332 based on diversity of citizenship.

21. Venue is proper in this District pursuant to 28 USC § 1391 in that a substantial part of the events giving rise to this claim occurred in this District and Defendant is a resident of this District as it is subject to the court's personal jurisdiction with respect to this civil action. Defendant is also registered to do business in this state.

## OPERATIVE FACTS

22. Defendant desired to contract with the United States Coast Guard to provide Base Operation Support Services ("BOSS") at the USCG Base in Kodiak, Alaska (the "Contract"). The Contract was solicited by a published request for proposals by the Coast Guard (the "Solicitation"). The Solicitation was published as a Small Business Association ("SBA") small business set aside opportunity under the SBA's Section 8(a) Program ("8(a)").

23. Under the Solicitation, the Contract would be awarded to the bidder offering the best value to the Government based on the offeror's proposed price, technical solution, and past performance. As this was an 8(a) set aside, the Solicitation allowed a small business to team with another company to improve its proposal.

24. Defendant, by itself, lacked the experience, reputation, ability, and skill to obtain the Contract from the Government. Defendant had no direct past performance in BOSS contracts.

25. KIRA was not an 8(a) contractor, so it could not directly bid on this 8(a) set-aside solicitation, but it could subcontract with an 8(a) contractor to make the 8(a) contractor more competitive in this arena using KIRA's past performance, experience, and ability.

26. To present and propose the experience, reputation, ability and skill necessary to obtain such a contract, Defendant entered into the Teaming Agreement KIRA so that Defendant could represent that such experience and ability would be a part of its team if ultimately awarded the contract. KIRA, at the time of the Teaming Agreement, had over 30 years of BOSS contract experience with superior/excellent ratings on its past performance.

27. KIRA agreed to allow Defendant to use its past performance, reputation, and ability in the proposal process in exchange for certain considerations, *i.e.,* work and products used, *inter alia,* if and when the solicitation was awarded to Defendant.

28. To induce KIRA to enter into the Teaming Agreement, Defendant, repeatedly and throughout the proposal development, promised KIRA it would incorporate into Defendant's bid KIRA's use of handheld computers that track the equipment status/physical assets and other innovations though systems like MAXIMO ("MAXIMO") that KIRA had used on other BOSS contracts and that Defendant would bear the cost of MAXIMO.

29. KIRA relied upon the representations of Defendant and invested in the proposal process to assist in winning the solicitation.

30. MAXIMO substantially increases productivity, reducing man hours and expenses, and allows a company to decrease its staffing and costs of performance. KIRA instructed Defendant on how MAXIMO would work and provided the proposal inputs for the use of MAXIMO for this particular solicitation, although the Teaming Agreement did not require KIRA to do so.

5

31. KIRA's innovations, built around MAXIMO, were central to the entire proposal, and KIRA would not have agreed to participate in this proposal without the implementation of MAXIMO.

32. The Solicitation described the volume of work needed to perform the Contract. All interested bidders needed to estimate the staff it would hire to perform this work. Since Defendant and KIRA were teamed up, KIRA needed to estimate the staff for its portion of the work and the resulting expense to KIRA of such performance.

33. Beginning in April 2016, KIRA began providing its inputs to Defendant for use in the Defendant's bid in response to the Solicitation. KIRA stated that these inputs were based on the purchase by Defendant and the use of MAXIMO on the project to streamline workforce and control costs.

34. June 15, 2016, was the effective date for the purchase of KIRA by THTBC.

35. THTBC, through its subsidiary T&H Services, which is and was an eligible 8(a) contractor, could have bid directly on the Solicitation. Rather than bid the project directly as an 8(a) company, T&H continued to work with Defendant and used the Teaming Agreement to support Defendant's bid efforts. Notably, the Teaming Agreement and the representations made throughout the bid process were relied upon because, *inter alia,* of Defendant's promise to KIRA to pay for and use MAXIMO on the project if Defendant obtained the Contract. The implementation of MAXIMO was key to KIRA's costs and resulting profits.

36. On August 22, 2016 in a meeting in Colorado, KIRA employee Mark Bartle further explained to Dagwood Shoemaker and Thomas Fite, two senior CDS employees, the benefits of MAXIMO and why KIRA's bid was based on its use. Shoemaker and Fite promised

6

KIRA that Defendant would implement MAXIMO and in fact included MAXIMO driven costs in its bid.

37. During the summer of 2016, to assist Defendant in obtaining the Contract, KIRA provided Defendant with three past performance references to submit with Defendant's bid.

38. Throughout September and October 2016, Mark Bartle had multiple conversations and exchanged multiple emails with Christopher Costa the CDS employee who was responsible for developing the pricing model for CDS's proposal. Costa resided and worked in Anchorage, Alaska.

39. During his conversations with Costa, Bartle stated multiple times that KIRA's staffing was based on the use of MAXIMO.

40. Costa also asked Bartle to develop the costs for purchasing and implementing MAXIMO in Kodiak. Costa built CDS's price model to include these implementation costs. Costa shared this price model with Bartle.

41. Based on Defendant's multiple promises to purchase and implement MAXIMO, Bartle submitted KIRA's final staffing inputs to CDS in October 2016.

42. On October 20, 2016, Defendant submitted its bid incorporating KIRA staffing, pricing and innovations (including MAXIMO) and KIRA's three past performance references.

43. Although the Defendant failed to supply to KIRA or T&H Defendant's final proposal, upon information and belief, Defendant incorporated KIRA's qualifications and products into the proposal in order to win the solicitation and be awarded the contract.

44. In November 2016, Bartle spent a total of six days working with Defendant to prepare for its oral presentation to the Coast Guard. Costa requested Bartle's assistance to

7

incorporate examples of MAXIMO efficiencies and cost savings into the presentation. Fite and Costa requested Bartle attend the oral presentation and brief on MAXIMO implementation.

45. Consistent with its prior representations to KIRA, in November 2016, Defendant made an oral presentation to the Coast Guard which included the representation that MAXIMO would be used on the project. Bartle attended the oral presentation and briefed the Coast Guard on how KIRA used MAXIMO and how it would be used on the Contract.

46. Because of KIRA's input, history, support, and lower cost based on use of MAXIMO, Defendant was determined the best value to the Coast Guard and was awarded the Contract.

47. As contemplated by the Teaming Agreement, to enable Defendant to perform the Contract, Defendant issued the Subcontract for Plaintiff to provide services, including management of the Base Operation Support Services, for a firm, fixed monthly price.

48. T&H, which took the place of KIRA, who was now owned by T&H's parent, in reliance on Defendant's promises to (1) pay for and use MAXIMO to control T&H's costs, and (2) allow T&H to manage onsite the performance of tasks for which T&H would be responsible under the Subcontract, entered into the Subcontract. *As Defendant knew,* without those promises, T&H would not have entered into the Subcontract.

49. Despite its repeated promises and representations/presentations to the Government to implement MAXIMO, Defendant refused to implement the streamlined cost-controlling system; thereby driving up T&H's costs substantially while failing to adjust the fixed fee amount Defendant paid T&H.

8

50. Although having told T&H on multiple occasions that T&H would have a management role to control its work force costs, as captured in the preamble of the Subcontract, Defendant has failed to give T&H a management position on site.

51. Defendant, induced T&H by Defendant's continuous promises and representations to enter into a Subcontract, which it did not intend to honor, as evidenced by its breach from the onset.

52. Defendant's failure to allow T&H to have management on site and Defendant's failure to utilize the MAXIMO cost controls T&H's employees incurred unanticipated overtime causing T&H to incur extra costs beyond those utilized in the bid inputs without compensation.

53. By May 2018, T&H had over $500,000 of overtime charges for its employees in performance of the Subcontract which Defendant caused.

54. Every subsequent month T&H has incurred and continues to incur additional overtime costs for which that Defendant refuses to pay.

55. On September 20, 2018, the Defendant's representative, Terry Lanham, with authority to resolve the matter met with T&H representatives and promised to make T&H whole.

56. On October 10, 2018, T&H informed Defendant's representative that, as of that date, Defendant had not paid the $564,950.90 unpaid overtime. T&H also informed Defendant that the amount of these losses was growing every month.

57. Terry Lanham, an agent and representative of Defendant who had authority to settle/negotiate claims, who had agreed to make T&H whole, breached the promise to pay the overtime and refused to pay the other outstanding invoices as required by the Subcontract.

**COUNT I: FRAUD IN THE INDUCEMENT**

58. Paragraphs 1 through 57 are realleged and restated.

9

59. To induce T&H to support Defendant's bid, Defendant promised that the work performed pursuant to the Subcontract would utilize MAXIMO and would be overseen by T&H's manager.

60. Those promises were material to T&H's decision to execute the Subcontract and T&H relied upon them in deciding to execute the Subcontract.

61. Defendant has failed to honor its repeated representations to T&H.

62. As confirmed by Defendant's conduct immediately following the execution of the Subcontract, and continuous behavior regarding its prior representations, Defendant had no intention to honor those promises when made.

63. Because of Defendant's fraud in inducing T&H to execute the Subcontract, T&H is entitled to rescission of the Subcontract.

64. T&H, as a result of the knowing, intentional misrepresentation of material fact on which T&H relied in executing the Subcontract, as of November 19, 2018, T&H has incurred actual damages of at least $793,932.67, this figure increases every week.

65. Because of Defendant's fraudulent misconduct, T&H is entitled to an award of punitive damages, the exact amount to be decided, but not less than treble damages caused by Defendant's conduct.

### COUNT II: IN THE ALTERNATIVE, BREACH OF CONTRACT

66. Paragraphs 1 through 65 are realleged and restated.

67. Defendant has failed to implement MAXIMO and to provide T&H with a management position as promised by Defendant in the bid formulation process, thereby breaching its contract with T&H.

68. Due to Defendant's failure to perform as promised, T&H has incurred additional costs of at least **$793,932.67**, for which Defendant is responsible.

69. Defendant has failed to pay for those additional costs and therefore has breached its contract.

WHEREFORE, Plaintiff requests this Court to enter judgment against Defendant cancelling the Subcontract and for Plaintiff's actual damages and punitive damages proven at trial, along with Plaintiff's attorney fees and costs, and all other relief to which Plaintiff is entitled.

Respectfully submitted,


___/s Christine V. Williams_____

Christine V. Williams, AK Bar No. 0204007
Outlook Law, LLC
1016 West 6th Avenue, Suite 306
Anchorage, Alaska 99501
(907) 258-2200
christinewilliams@outlooklaw.com