# UNITED STATES DISTRICT COURT
# DISTRICT OF ALASKA

T & H Services, LLC,
    Plaintiff,
vs.
Choctaw Defense Services, Inc.,
    Defendant.

3:18-CV-00296 JWS

ORDER AND OPINION

[Re: Motion at doc. 17]

## I. MOTION PRESENTED

At docket 17 Defendant Choctaw Defense Services, Inc. (Defendant or CDS) filed a Motion to Dismiss Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). The motion was filed with redactions. An unredacted, sealed motion was filed at docket 21. The confidential contracts at the heart of the parties' dispute were filed under seal at dockets 21-1 and 21-2. Plaintiff T&H Services, LLC (Plaintiff or T&H) filed its unsealed response at docket 25. CDS filed an unsealed reply at docket 26.

## II. BACKGROUND

At some point prior to January 6, 2016, the United States Coast Guard (USCG) issued a request for proposals for the provision of Base Operation Support Services (BOSS) at the base in Kodiak, Alaska (the RFP). The RFP was published as a small business set aside opportunity under the Small Business Administration's Section 8(a) Program. CDS qualified under Section 8(a) to bid on the RFP, but sought to team with

KIRA, Inc. (KIRA), which had more experience in BOSS contracting work but was not itself a Section 8(a) contractor and, therefore, could not directly submit a bid for the Kodiak BOSS contract.

On January 6, 2016, CDS entered into a Teaming Agreement with KIRA whereby KIRA agreed "to work together [with CDS, as CDS's subcontractor] to prepare and submit a proposal to the [USCG] in response to the RFP."[1] The proposal required CDS to estimate the staff it would hire to perform the work required under the BOSS contract. KIRA consequently had to estimate the staff it would use to fulfill its portion of the work that it would be doing as a subcontractor and estimate how much that staffing would cost. In order to make such estimations, KIRA discussed with CDS the use of a specific software system referred to in the complaint as "MAXIMO." KIRA had used MAXIMO in fulfillment of other BOSS contracts to operate "handheld computers that track the equipment status/physical assets" on a base.[2] KIRA used MAXIMO because it "substantially increases productivity, reducing man hours and expenses, and allows a company to decrease its staffing and cost of performance."[3] According to the complaint, CDS promised KIRA that it would purchase MAXIMO software and incorporate the use of MAXIMO in its proposal to the USCG, and KIRA then began providing its staffing numbers and costs to CDS based on the understanding that CDS would purchase and use MAXIMO.

Plaintiff alleges that KIRA representatives had multiple conversations and exchanged multiple emails with various CDS representatives about how its pricing was based on the use of MAXIMO. It alleges that CDS asked KIRA to develop a "price

---

[1] Doc. 21-1 at p. 1 (Article 1.1 of Teaming Agreement). The Teaming Agreement may be considered here as its contents are integral to the complaint and its authenticity is not questioned. See infra n.18.

[2] Doc. 1 at ¶ 28.

[3] Doc. 1 at ¶ 30.

-2-

model" that included the "implementation costs" of MAXIMO.[4] It alleges that the final submission to USCG included KIRA's staffing numbers and pricing that were based on MAXIMO, as well as the costs of implementing MAXIMO. It alleges that when preparing for an oral presentation related to the bid the parties discussed the implementation of MAXIMO, and then during the presentation CDS representatives "briefed the [USCG] on how KIRA used MAXIMO" and how it would be used in implementing the Kodiak BOSS contract.[5]

Prior to CDS's submission of its proposal to the USCG, Tlingit Haida Tribal Business Corporation (THTBC) purchased KIRA. T&H is a subsidiary of THTBC and is an eligible 8(a) contractor. While THTBC could have bid on the RFP through T&H, it decided to continue to work with CDS under the Teaming Agreement by having T&H take KIRA's place.

In November of 2016, CDS was awarded the Kodiak BOSS contract. As contemplated by the Teaming Agreement, CDS executed a subcontract with T&H wherein T&H agreed to perform its portion of the services outlined in the BOSS contract for a fixed monthly price (the Subcontract).[6] T&H alleges that it would not have entered into the Subcontract without CDS's promise to pay for and use MAXIMO on the project. It alleges that the use of MAXIMO was the foundation for its staffing numbers and profit calculations.

Ultimately, CDS did not implement the MAXIMO system. T&H alleges that because of CDS's "failure to utilize the MAXIMO cost controls T&H's employees incurred unanticipated overtime causing T&H to incur extra costs beyond those utilized

---

[4]Doc. 1 at ¶ 40.

[5]Doc. 1 at ¶ 45.

[6]The Subcontract may be considered here as its contents are integral to the complaint and its authenticity is not questioned. *See infra* n.18.

-3-

in the bid inputs . . . ."[7] It alleges that as of May 2018 these extra overtime costs totaled $500,000 and that every month it continues to incur these unanticipated costs. T&H also alleges that CDS had promised T&H an onsite management position to oversee the performance of tasks for which T&H would be responsible but failed to provide T&H such a position. It alleges that its lack of management on site has contributed to staffing inefficiencies. CDS refuses to pay T&H for anything beyond the monthly fixed price in the Subcontract.

As a result of failed discussions on the matter, T&H filed this lawsuit, alleging one count of fraud in the inducement and one count of breach of contract. CDS now moves to dismiss both counts based on Rule 12(b)(6), arguing the T&H complaint fails to state a claim based on the terms of the Subcontract. It moves to dismiss the fraud in the inducement claim for the added reason that T&H failed to set forth the necessary details required under Rule 9(b).

### III. STANDARD OF REVIEW

Rule 12(b)(6) tests the legal sufficiency of a plaintiff's claims. In reviewing such a motion, "[a]ll allegations of material fact in the complaint are taken as true and construed in the light most favorable to the nonmoving party."[8] To be assumed true, the allegations "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."[9] Dismissal for failure to state a claim can be based on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged

---

[7]Doc. 1 at ¶ 52.

[8]*Vignolo v. Miller,* 120 F.3d 1075, 1077 (9th Cir. 1997).

[9]*Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

-4-

under a cognizable legal theory."[10] "Conclusory allegations of law . . . are insufficient to defeat a motion to dismiss."[11]

To avoid dismissal, a plaintiff must plead facts sufficient to "'state a claim to relief that is plausible on its face.'"[12] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[13] "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."[14] "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"[15] "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief."[16] "In all cases, evaluating a complaint's plausibility is a 'context-specific' endeavor that requires courts to 'draw on ... judicial experience and common sense.'"[17]

In deciding whether to dismiss a claim under Federal Rule of Civil Procedure 12(b)(6), the Court is generally limited to reviewing only the complaint, but documents whose contents are incorporated into and integral to the complaint and

---

[10]*Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

[11]*Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001).

[12]*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[13]*Id.* (citing *Twombly*, 550 U.S. at 556).

[14]*Id.* (citing *Twombly*, 550 U.S. at 556).

[15]*Id.* (quoting *Twombly*, 550 U.S. at 557).

[16]*Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009); *see also Starr*, 652 F.3d at 1216.

[17]*Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)).

whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss.[18] Leave to amend must be granted "[u]nless it is absolutely clear that no amendment can cure the defects."[19]

Under Rule 9(b), a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake."[20] To be particular the complaint must state "the who, what, when, where, and how" of the misconduct."[21] This includes setting forth "what is false or misleading about a statement, and why it is false."[22] These specifics are required "to give the defendants notice of the particular misconduct which is alleged to constitute the fraud charged so they can defend against the charge and not just deny that they have done anything wrong."[23] The requirement for specifics also "protects against false or unsubstantiated charges."[24]

If a complaint or claim within a complaint fails to meet the requirements of Rule 9(b), dismissal is appropriate.[25] Dismissals under Rule 9(b) are functionally equivalent to dismissals under Rule 12(b)(6) and therefore leave to amend should be

---

[18]*Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994) *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010).

[19]*Lucas v. Dep't of Corrs.*, 66 F.3d 245, 248 (9th Cir.1995) (per curiam); *see also Lopez v. Smith*, 203 F.3d 1122, 1126 (9th Cir.2000) (en banc).

[20]Fed. R. Civ. P. 9(b).

[21]*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

[22]*United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016).

[23]*Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (internal quotation marks omitted).

[24]*United Healthcare Ins. Co.*, 848 F.3d at 1180.

[25]*Vess*, 317 F.3d at 1107.

granted unless it is clear that the complaint cannot be cured by including additional facts.[26]

## IV. DISCUSSION

**A. Breach of Contract**

In its complaint T&H alleges that "[CDS] has failed to implement MAXIMO and to provide T&H with a management position as promised by Defendant in the bid formulation process, thereby breaching its contract with T&H."[27] CDS asserts that T&H has not pled any plausible breach of contract and cannot do so. It asserts that the Subcontract does not impose any obligation on CDS to implement MAXIMO nor does it require CDS to allow T&H an onsite management position.

T&H argues that the use of MAXIMO is expressly included in and incorporated into the Subcontract. It relies on the fact that the Subcontract incorporates a Performance Work Statement and that the Performance Work Statement requires the use of MAXIMO. The Performance Work Statement states as follows:

> The Government will provide, via Coast Guard computer network, access to a CMMS. The Contractor will be responsible for utilizing this program to, at a minimum, track work order and preventative maintenance completion, and personnel man-hour expenditures . . . The Government's current CMMS is IBM Maximo. The Government reserves the right to update or change software.[28]

The court agrees with CDS that "[s]uch language cannot reasonably be read to obligate CDS to implement MAXIMO in the course of fulfilling the BOSS contract."[29] The provision refers to the software as belonging to and used by the Government and gives the Government the option to change software. There are no allegations that the Government's "IBM Maximo" software is the same as the MAXIMO software T&H

---

[26]*United Healthcare Ins.*, 848 F.3d at 1182.

[27]Doc. 1 at ¶ 67.

[28]Doc. 21-2 at p. 214.

[29]Doc. 26 at p. 7.

-7-

expected CDS to use, and there are no allegations asserting that the Government's software dictated what software CDS used.

T&H also asserts in its response that the Subcontract's scope of work states that all services must be performed to the "specifications, standards, and requirements set forth in the Prime Contract."[30] T&H does not cite any specific provision in the underlying BOSS contract that dictates the use of MAXIMO, and the complaint does not set forth any allegation about the specifications, standards, and requirements of the underlying contract.

More persuasively, however, T&H argues that the use of MAXIMO was a part of the parties' contract because it underlies the staffing plan it submitted and that was included in the Subcontract as Attachment B, which in turn was the basis for the fixed price that CDS was obligated to pay T&H. While the staffing plan in Attachment B does not expressly incorporate an obligation on the part of CDS to use MAXIMO, it creates, along with the other allegations in the complaint, a plausible claim that the use of MAXIMO was an additional term consistent with and supplementing the parties' agreement.

CDS counters that no additional terms could plausibly be a part of the parties' agreement based on the Subcontract's integration clause. An integration clause, however, is not conclusive proof of complete integration, only partial integration.[31] Unlike a completely integrated contract—where the contract is the complete and exclusive statement of the parties' agreement and thus unable to be supplemented by any additional terms within the scope of the contract—a partially integrated contract can

---

[30]Doc. 25 at pp. 7-8; Doc. 21-2 at p. 1.

[31]*Kupka v. Morey*, 541 P.2d 740, 748 (Alaska 1975) (adopting the view that an integration clause does not have a *conclusive* effect as to the parties intent to integrate but rather "merely strengthens the presumption that a written contract is the final repository of the agreement").

be supplemented with consistent terms.[32] That is to say, unless a contract is completely integrated, evidence of a consistent additional term is admissible to supplement the written agreement.

Whether a contract is in fact completely or partially integrated depends on the intent of the parties and "can be proved by any relevant evidence."[33] An integration clause certainly "strengthens the presumption that a written contract is the final repository of the agreement."[34] Even if a contract is determined to be a completely integrated one, a prior agreement may nonetheless be enforced as an independent obligation if the alleged prior agreement is not within the scope of the integrated written agreement.[35] If a contract is determined to be only partially integrated—that is, not a complete recitation of the entire bargain—the question is whether the additional term sought to be enforced is consistent or inconsistent with the explicit terms of the written contract. Such a determination "requires interpretation of the writing in the light of all the circumstances, including the evidence of the additional term. For this purpose, the meaning of the writing includes not only terms explicitly stated but also those fairly implied as part of the bargain of the parties in fact."[36]

Here, the allegations in the complaint set forth a plausible breach of contract claim based on allegations that the parties had an agreement to implement and use MAXIMO. CDS does not cite any provision in the Subcontract that is inconsistent with the alleged agreement to use MAXIMO but, rather, merely asserts that the Subcontract

---

[32]*Froines v. Valdez Fisheries Dev. Ass'n, Inc.*, 75 P.3d 83, 86-87 (Alaska 2003); Restatement (Second) of Contracts § 216(1) (1981).

[33]Restatement (Second) of Contracts § 210 cmt. b (1981); *see also Alaska Northern Development, Inc. v. Alyeska Pipeline Serv. Co.*, 666 P.2d 33 (Alaska 1983).

[34]*Kupka*, 541 P.2d at 748.

[35]Restatement (Second) of Contracts § 213 cmt. c (1981).

[36]Restatement (Second) of Contracts § 216 cmt. b (1981).

does not contemplate its use. The allegations are detailed enough as to the parties' discussions regarding MAXIMO to set forth a plausible claim that, while not written in the Subcontract itself, the use of MAXIMO was a consistent underlying term of the parties' bargain.

As to the allegation about a promised onsite management position, T&H did not respond to CDS's argument that the Subcontract does not contain an obligation to provide T&H a management position. The court has not found such an obligation. Additionally, unlike the issue of MAXIMO, there are insufficient allegations in the complaint from which to infer that such an additional term was fairly implied as part of the parties' bargain. Therefore, to the extent T&H's breach of contract claim is premised on the failure to provide an onsite management position, dismissal is appropriate.

**B.    Fraud in the Inducement**

CDS also asks the court to dismiss T&H's claim for fraud in the inducement. A fraud in the inducement claim requires a plaintiff to show that (1) there was a misrepresentation; (2) the misrepresentation was fraudulent; (3) the misrepresentation induced the plaintiff to enter into the contract; and (4) the plaintiff's reliance on the misrepresentation was justified.[37] CDS argues that such a claim is not plausible under Rule 12(b)(6) because T&H will be unable to show justified reliance. It asserts that because the Subcontract "includes an integration clause, contemplates the same subject matter as an alleged oral promise, and [was] executed after such alleged promise is made" T&H's reliance on the alleged oral promise was not justifiable.[38]

In the cases CDS cites in support of its position, the plaintiffs could not show justified reliance because the alleged prior promises were *directly* considered or contradicted in the integrated agreement. Based on these cases, whether the alleged oral promise "contemplates the same subject matter" is a specific inquiry into the

---

[37]*Indus. Comm. Elec., Inc. v. McLees,* 101 P.3d 593, 599 (Alaska 2004).

[38]Doc. 21 at p. 13.

-10-

provisions contained in the written contract and is not satisfied simply because the promise generally relates to the overall subject matter of the written agreement. For example, in *Mann v. GTCR Golder Rauner, LLC*,[39] the plaintiffs alleged that the defendant had made a handful of promises regarding the funding and management of a new company the parties were going to form and the compensation the plaintiffs would receive as part of the new company. They alleged that those promises induced them to withdraw from their senior positions in a different company and enter into agreements related to the new company. The court concluded that there could be no justified reliance on the oral promises because the subsequent contracts the parties executed had provisions that addressed the same specific subjects. That is, there were provisions in the written contracts that covered, funding, management, and compensation.[40] Plaintiff was therefore not justified in relying on any oral promises that covered these same topics.

The same is true in another case relied on by CDS, *Sussex Financial Enterprises, Inc. v. Bayerische Hypo-Und Vereinsbank AG*,[41] where the court found that the plaintiff could not have reasonably relied upon the defendants alleged misrepresentation because the misrepresentation "directly contradicted the express terms of the contract."[42] Unlike these cases, the Subcontract is silent on the specific matter of CDS's use or choice of software; CDS does not cite a provision that contradicts the alleged oral promise made by CDS regarding software use or otherwise

---

[39] 425 F. Supp. 2d 1015 (D. Ariz. 2006).

[40] *Id.* at 1035.

[41] 460 Fed. Appx. 709 (9th Cir. 2011).

[42] *Id.* at 712. *See also Glenn K. Jackson Inc. v. Roe*, 273 F.3d 1192, 1201 (9th Cir. 2001) (upholding the lower court's ruling that the plaintiff could not prove justifiable reliance on misrepresentations about an accounting firm's auditing credentials because the written agreement between the plaintiff and its client specifically contemplated the issue of audits and gave complete and unchecked discretion to the client in deciding to audit and in selecting an auditor).

-11-

demonstrates that the subject of CDS's software was directly contemplated in the Subcontract. Therefore, T&H's reliance on any alleged oral promise is at least plausibly justifiable.

Alaska case law also fails to support CDS's position. In *Diagnostic Imaging Center Associates v. H&P*,[43] the plaintiff sought reformation of the parties' settlement agreement. The settlement agreement was meant to resolve a dispute between the parties regarding the plaintiff's sublease and purchase of ultrasound equipment, and the plaintiff argued that its consent to the settlement was induced by a misrepresentation concerning the length of the defendant's underlying equipment lease. The plaintiff alleged that the defendant said its equipment lease expired in the summer of 1989, and therefore plaintiff had agreed to make sublease payments on the equipment through September 1, 1989. The plaintiff alleged that it would not have agreed to pay the defendant beyond what was needed to pay off the defendant's lease, and therefore would not have agreed to pay through September of 1989, if it had known that the underlying lease was set to end a year earlier.

The court held that the claim could survive summary judgment. It did not specifically address the issue of justifiable reliance, but CDS argues that, unlike the situation alleged in T&H's complaint, the plaintiff in *Diagnostic Imaging* had a viable fraud in the inducement claim because the misrepresentation as to the expiration date of the underlying lease was material to and "incorporated" into the written settlement agreement.[44] The written settlement agreement did not explicitly reference or incorporate the length of the underlying lease.[45] Instead, the plaintiff in that case had alleged that the duration of the underlying lease informed its decision to agree, in writing, to make sublease payments through September 1, 1989, and therefore the

---

[43]815 P.2d 865 (Alaska 1991).

[44]Doc. 26 at p. 5.

[45]815 P.2d at 866.

alleged misrepresentation became the basis for one of the written terms. The court does not see a distinction between the claim in *Diagnostic Imaging* and T&H's claim. T&H alleges that CDS represented it would use the MAXIMO software and that this promise became the basis for its agreement to provide the staffing at the agreed upon price.

In *Johnson v. Curran*,[46] the court affirmed the lower court's summary judgment ruling in favor of the defendant as to the plaintiff's fraud in the inducement claim. In that case the plaintiff, a nightclub owner, entered into a written contract engaging the defendant, a band, to perform at her club for a period of two months. The plaintiff alleged that the band failed to draw customers as expected, and she fired the band about one month before the expiration of the agreement. She refused to pay the band for the last two weeks under the contract, alleging that before she signed the contract a member of the band had orally agreed that she could terminate their engagement on two weeks' notice if the band did not perform well. The court concluded that the written contract contained an explicit, unambiguous provision about the duration of the band's residency at the night club that was inconsistent with the alleged promise of early termination. The court went on to find that there was no evidence that the band induced her to enter into a written contract that failed to include a provision about early termination. It noted that even if a "failure to warn a party of his possible misapprehension of a contract term may constitute a misrepresentation, . . [it could not] conclude that [the plaintiff] may have been passively misled in that fashion."[47] There was no evidence that the plaintiff somehow failed to read the contract, that she read it but failed to understand its terms, or that she was deceived about the contract's terms. The same situation is not presented here. As noted above, the Subcontract is silent on

---

[46]633 P.2d 994 (Alaska 1981).

[47]*Id.* at 998.

-13-

the specific subject of the alleged oral promise; it does not address the subject of CDS's use of computer software.

Alternatively, CDS argues that T&H failed to plead its fraud in the inducement claim with the requisite specificity required under Rule 9(b). Under Rule 9(b) T&H must provide the "the who, what, when, where, and how" of the misconduct, and must identify "what is false or misleading about a statement, and why it is false."[48] In its response brief, T&H details the allegations in its complaint that meet this standard as to its claim that CDS falsely promised to use and implement MAXIMO. These allegations provide sufficient details about the who, what, where, when, and how of the alleged misrepresentation to allow CDS to defend against the charge. CDS argues that the alleged fraudulent statements and promises were made over a year before the parties executed the Subcontract, and therefore the complaint fails to detail what specific statements induced them to sign the Subcontract itself. Such an argument goes to the strength of T&H's claim, not the sufficiency of it. The complaint adequately explains the basis for T&H's fraudulent inducement claim.

To the extent T&H rests its fraudulent inducement claim on CDS's alleged promise that T&H would have an onsite management position, the complaint fails to provide the requisite specifics.

## V. CONCLUSION

Based on the preceding discussion, CDS's motion to dismiss is DENIED as to T&H's claims for breach of contract and fraud in the inducement based on allegations that CDS failed to implement and use MAXIMO software as promised. The motion is GRANTED as to T&H's claim for breach of contract and fraud in the inducement based on allegations that CDS failed to provide T&H an onsite management position as

---

[48]*Vess*, 317 F.3d at 1106 (internal quotation marks omitted).

promised.  T&H is granted leave to amend the complaint.  Any amended complaint shall be filed within 14 days.

DATED this 17th day of June 2019.

/s/ JOHN W. SEDWICK
SENIOR JUDGE, UNITED STATES DISTRICT COURT

-15-